Michael D. Harris, No. 59,470 mharris@socalip.com
Marina Lang, No. 251,087 mlang@socalip.com
Brian Tamsut, No. 322,780, btamsut@socalip.com
SOCAL IP LAW GROUP LLP
310 N. Westlake Blvd., Suite 120
Westlake Village, CA 91362-3788
Phone: (805) 230-1350 • Fax: (805) 230-1355

Attorneys for Plaintiff Athena Cosmetics, Inc.

### UNITED STATES DISTRICT COURT

### CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| Athena Cosmetics, Inc.,<br><br>    Plaintiff,<br><br>        v.<br><br>AMN Distribution Inc., et al,<br><br>    Defendants. | No. 2:20-cv-05526-SVW-SHK<br><br>Athena's Notice of Motion and Motion for Summary Judgment against Defendants AMN Distribution, Inc. and Moishe Newman and Memorandum of Points and Authorities<br><br>Date: January 10, 2022<br>Time: 1:30 p.m.<br>Judge Wilson |

To Defendants AMN Distribution Inc. and Moishe Newman and their attorney:

**Please take notice** on January 3, 2022, at 1:30 p.m., in the courtroom of Judge Wilson, United States Courthouse,  350 W. 1st Street, Courtroom 10A, Los Angeles, California, plaintiff Athena Cosmetics, Inc. ("Plaintiff" and "Athena") will move for summary judgment against defendants AMN Distribution, Inc. and Moishe Newman under FED. R. CIV. P. 56 under the first through fifth claims for relief of the First Amended Complaint.

Michael Harris, counsel for Athena notified defense counsel on November 22 of its plans to move for summary judgment and requested a conference under Civil Local Rule 7-1. Opposing counsel Voss emailed back the next day saying he was ill but would return to work the following day. Mr. Harris emailed Mr. Voss on November 30, asking, "Email me a time for you to confer tomorrow. On December 2, Mr.

Voss wrote, "… I am not in today... Might be in tomorrow mid-day." Later that day, Mr. Harris emailed back, "Call me tomorrow." Mr. Voss did not call back.

Plaintiff relies on the concurrently filed Memorandum of Points and Authorities and the declarations of Christina Felix and Michael Harris. Plaintiff also submits a statement of uncontroverted facts and conclusions of law and a proposed judgment. Exhibits 1 through 3, the April 30 agreement, and Schedules 1 and 2, and Exhibits 7 through 14, Athena's trademark registrations and related documents are exhibits to this memorandum. The other exhibits are attached to the Felix and Harris declarations.

## TABLE OF CONTENTS

**Page**

A. Introduction ..................................................................................................... 1

B. Facts ................................................................................................................. 2

    1. Athena's business ...................................................................................... 2

    2. Defendants Sales of Counterfeits and Athena's Action to Stop the Counterfeits ............................................................................................... 3

    3. Facts establishing defendant Newman's joint liability ............................. 5

C. Argument .......................................................................................................... 5

    1. Summary Judgment Standards ................................................................... 5

    2. Defendants breached their contract with Athena ...................................... 7

    3. As AMN's "guiding spirit," Mr. Newman also is liable for defendants' infringement and counterfeiting ......................................... 7

    4. Two sources, Christina Felix's declaration showing her "secret shopper" purchases, and Schedule 2, showing defendants sales, confirm defendants sold Athena counterfeits. .................................... 9

        a. Defendants sold Athena counterfeits which Christina Felix purchased. ........................................................................................ 9

b.   Schedule 2 to the 2020 Agreement admits defendants' counterfeit sales in 2019. ..... 13 Dov, Devorah, and Nechemiah Newman

5.   Defendant sold at least 4,474 counterfeit Athena products. ...........................14

6.   Defendants are liable for three-times their actual profits and statutory damages up to $2 million per infringed mark. ...............................15

    a.   The statute provide defendants are liable for three-times their actual profits plus attorney fees. ...........................................15

    b.   The statute requires treble damages. .......................................16

    c.   Defendants also are liable for statutory damages up to $2 million. ...........................................................................18

7.   Defendants also are liable for attorney fees under the Lanham Act and under a clause of the 2020 Agreement. .......................................20

    a.   The Lanham Act provides for an automatic attorney fee award in counterfeiting cases like this one. .......................................20

    b.   Defendants also are liable for attorney fees under the 2020 Agreement. ...................................................................22

D.   Conclusion ............................................................................23

## TABLE OF AUTHORITIES

**Cases**                                                                      **Page(s)**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ............................... 5

*Asus Comput. Int'l v. Round Rock Research, LLC, No. 12-cv-02099 JST (NC)*, 2014 WL 1463609 (N.D. Cal. Apr. 11, 2014) ......................... 6

*Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251 (1946) ...................... 15

*C.A.R. Transp. Brokerage Co. v. Darden Restaurants, Inc.*, 213 F.3d 474 (9th Cir. 2000) ................................................. 5

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ............................ 5

*Chloe SAS v. Sawabeh Info. Serv. Co., 11-cv-4147-MMM* (MANx), 2015
    WL 12763541 (C.D. Cal. June 22, 2015) ........................................................ 20

*Comm. for Idaho's High Desert, Inc. v. Yost*, 92 F.3d 814 (9th Cir. 1996) ............. 7

*Copyright Act, Feltner v. Columbia Pictures TV, Inc.*, 523 U.S. 340 (1998) ......... 19

*Davis v. Metro Prods., Inc.*, 885 F.2d 515, n. 10 (9th Cir. 1989) ............................ 7

*Defendants in Louis Vuitton S.A. v. Spencer Handbags Corp.*, 765 F.2d 966
    (2d Cir. 1985) ............................................................................................... 15

*Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ................................. 5

*Fox v. Vice*, 563 U.S. 826 (2011) ............................................................................ 15

*Hard Rock Cafe Licensing Corp. v. Concession Serv., Inc.*, 955 F.2d 1143
    (7th Cir. 1992) ............................................................................................... 16

*eBay Inc. v. MercExchange, LLC*, 547 U.S. 388 (2006) ......................................... 21

*Applied Info. Scis. Corp. v. eBay, Inc.*, 511 F.3d 966 (9th Cir. 2007) ..................... 8

*K&N Eng'g, Inc. v. Bulat*, 510 F.3d 1079 (9th Cir. 2007) ...................................... 20

*Keds Corp. v. Goldstreet Holdings Inc.*, 92 -2950 SVW (KX), 1992 WL
    456626, at *5 (C.D. Cal. Aug. 14, 1992), *aff'd w/o opinion*, 19 F.3d 27
    (9th Cir. 1994) ............................................................................................... 16

*Levi Strauss & Co. v. Shilon*, 121 F.3d 1309 (9th Cir. 1997) ........................... 19–20

*Louis Vuitton S.A. v. Lee*, 875 F.2d 584 (7th Cir. 1989) ........................................ 16

*Mead Johnson & Co. v. Baby's Formula Serv.*, 402 F.2d 19 (5th Cir. 1968) .......... 7

*Moroccanoil, Inc. v. Groupon, Inc.*, 278 F. Supp. 3d 1157 (C.D. Cal. 2017) ......... 15

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545 (2014) .......... 20

*Playboy Enterp., Inc. v. Baccarat Clothing Co.*, 692 F.2d 1272 (9th Cir.
    1982) ....................................................................................................... 20-21

*Screen Gems-Columbia Music, Inc. v. Mark-Fi Records, Inc.*, 256 F. Supp.
    399 (S.D.N.Y. 1966) ...................................................................................... 16

*Skydive Ariz., Inc. v. Quattrocchi*, 673 F.3d 1105 (9th Cir. 2012) ........................ 15

*SunEarth, Inc. v. Sun Earth Solar Power Co.*, 839 F.3d 1179 (9th Cir. 2016) ........................................................................................ 20

*Keds Corp. v. Goldstreet Holdings Inc.*, 92 -2950 SVW (KX), 1992 WL 456626, at *5 (C.D. Cal. Aug. 14, 1992), *aff'd w/o opinion*, 19 F.3d 27 (9th Cir. 1994) ............................................................................... 16

*Tolan v. Cotton*, 572 U.S. 650 (2014) ........................................................ 5

**Statutes**

15 U.S.C. § 1114 ............................................................................... 3, 14

15 U.S.C. § 1116 ............................................................................... 14, 21

15 U.S.C. § 1117 ........................................... 3, 4, 14, 15, 17, 19, 20

15 U.S.C. § 1127 ............................................................................... 7, 20

**Rules**

Fed. R. Civ. P. 30 ................................................................................... 6

Fed. R. Civ. P. 50 ................................................................................... 7

Fed. R. Civ. P. 54 ................................................................................. 21

Fed. R. Civ. P. 56 ........................................................................ 1, 5, 21

### MEMORANDUM OF POINTS AND AUTHORITIES

## A. INTRODUCTION

"Counterfeiting is the act of producing or selling a product with a sham trademark that is an intentional and calculated reproduction of the genuine trademark." 4 J.T. McCarthy, *McCarthy on Trademarks and Unfair Competition* § 25:10 (5th ed. 2021)). Defendants are aggressive players in the business.

Defendants AMN Distribution, Inc. and its CEO, defendant Moishe Newman, have sold counterfeit Athena cosmetics, namely knockoffs of Athena's flagship REVITALASH® cosmetics line. After Athena threatened to sue defendants for counterfeiting, the parties settled in April 2020 ("2020 Agreement"). Athena agreed to release defendants' liability for past infringements conditioned on defendants performing certain acts. They promised they would never again market or sell any Athena products irrespective of authenticity. Athena demanded that promise because it did not trust defendants to know the difference between counterfeits and legitimate good. Defendants also promised to supply full and complete contact information of all their suppliers and customers of Athena goods. AMN and Mr. Newman also jointly warranted the schedules were accurate. Finally, defendants agreed to return all their inventory to Athena and to pay Athena $25,000. Athena's release was "[c]onditional on Defendants making the Settlement Payment, furnishing Schedules 1 and 2 … and Defendants' delivery of the entire remaining inventory of any goods or products with the Athena Cosmetics Marks." Ex. 1, § 4, p. 4. The two schedules are Exhibits 2 and 3.

As a result of the November 17 jury verdict in the bifurcated trial, defendants breached the 2020 Agreement. See Section C.2. of this brief. Because the acts that caused the breach cancels the agreement's release, defendants are liable for acts of counterfeiting and trademark infringement before and after the agreement.

Four sources establish defendants' counterfeiting. First, Schedule 2 lists the products "AMN sold or otherwise delivered … bearing Athena Cosmetics Marks to

various consumers" in 2019. All had to be counterfeit because defendants have no evidence the products were legitimate, and the supplier defendants mention, LinkAmerika, is not an authorized Athena distributor. Second, Christina Felix's declaration proves the products defendants sold were counterfeit, and defendants have no evidence they sold legitimate Athena goods. Third, defendants' prices at about half or three-fourths the retail price depending on size is evidence of counterfeiting. Fourth, defendants' refusal to produce books and records and correspondence with its suppliers is evidence the documents would establish counterfeiting.

**B.   FACTS**

### 1.   Athena's business.

Athena manufactures and sells high-end cosmetics under the REVITALASH® brand and other trademarks. Physician Michael Brinkenhoff founded Athena in 2006. Since then, this homegrown, Ventura, California, company became known for its original REVITALASH® eyelash conditioning serum, which Dr. Brinkenhoff developed. Now in 2021, Athena sells its award-winning luxury cosmetics throughout the United States and in selected foreign markets. Felix Decl. ¶ 4.

Athena owns these trademarks for its cosmetic products, including these United States Trademark Registrations:

      a.  No. 3,246,814 (May 29, 2007) for REVITALASH. ® Ex. 7.

      b.  No. 4,558,881 (July 1, 2014) for REVITALASH (LOGO).® Ex. 7a.

      c.  No. 3,526,373 (November 4, 2008) for ATHENA AND DESIGN. ® Ex. 8.

      d.  No. 3,413,360 (April 15, 2008) for ATHENA COSMETICS. ® Ex. 9.

      e.  No. 5,633,064 (December 18, 2018), for ETERNALLY PINK. ® Ex. 10.

      f.  No. 4,501,304 (March 25, 2014) for REVITALASH ADVANCED. ® Ex. 11.

      g.  No. 3,588,423 (March 10, 2009, for the mark REVITABROW. ® Ex. 12.

      h.  No. 4,501,307 (March 25, 2014) for REVITABROW ADVANCED. ® Ex. 13.

i.  No. 5,871,804 (October 1, 2019), for the mark shown

to the right (the "RL Logo registration"). Ex. 14.[1]

Athena displays all those trademarks with the ® symbol dur-

ing 2019 except for the RL Logo, which issued late that year. Other than the RL

Logo, which is too new, the other eight marks are incontestable. Dkt. 167-1, Pretrial

Conf. Order, Admitted Facts, Nos 3–6.

## 2. Defendants Sales of Counterfeits and Athena's Action to Stop the Counterfeits.

Christina Felix, a 13-year Athena employee, is its Customer Support Manager

and Anti-Diversion Manager. She also acts as Athena's secret shopper, buying prod-

ucts that bear the Athena Trademarks online from unauthorized webpages and online

retailers like eBay, Groupon, Walmart.com, and Amazon that contain advertising for

REVITALASH and the other "Athena Trademarks." Felix Decl. ¶ 8. She saves the or-

ders, receipts, shipping labels and products she receives from her orders. She found

suspect listings of Athena goods on brushexpress.com offering REVITALASH cosmet-

ics for sale. Felix Decl. ¶ 10, Ex. 4. Exhibit 5 to her declaration is her receipt, and Ex-

hibit 6 is the return address on the shipping label that displays Brush Express in

Plains, Pennsylvania as the shipper. Brush Express is defendant Newman's fictitious

name. See Ex. 1, the 2020 Agreement, p. 1. During discovery, defendants produced its

lease for its Pennsylvania warehouse at the address on the Exhibit 6 shipping label.

Harris Decl. Ex. 30.

Athena's attorneys wrote to Brush Express on February 11, 2020, Ex. 26, de-

manding it cease all advertising and sales immediately. Athena settled with defend-

ants on the condition it could learn the identities of those manufacturing defendants'

---

[1] REVITALASH, REVITALASH (LOGO), ATHENA AND DESIGN, ATHENA COSMETICS, ETERNALLY PINK, REVITALASH ADVANCED, REVITABROW, REVITABROW ADVANCED and the RL Logo are collectively "Athena Trademarks." The registrations were admitted facts in the pretrial conference Order, Dkt.167–1.

counterfeits. To obtain that information, Athena was willing to forego obtaining statutory damages of up to $2 million for each Athena Trademark counterfeited. 15 U.S.C. § 1117(c).

The 2020 Agreement (Ex. 1) includes these terms:

a.   AMN would prepare Schedules 1 and 2 (Exs. 2 and 3) for Athena to obtain accurate contact information about defendants' customers and suppliers. Though only AMN had the duty to prepare the schedules, both defendants, AMN and Moishe Newman, warranted the schedules contained the full and complete contact information of all sellers and suppliers and the amount of product purchased and sold. Ex. 1, pp. 2–3.

b.   Defendants would never market or sell Athena products. *Id.* p. 3.

c.   Defendants would return all inventory of Athena products to Athena. *Id.*

d.   Defendants would pay Athena $25,000. *Id.* p. 4.

In exchange for defendants' obligations and conditioned on their full performance, Athena conditionally released defendants AMN and Moishe Newman from past infringements. Corporate defendant AMN agreed to prepare the two accurate schedules of the contact information and the amount of product purchased from of its suppliers and the amount of product sold to each customer. (Ex. 1, ¶ 9.g.).

Accurate schedules were crucial to Athena. Counterfeiters use fictitious names and aliases and discovering the true identity of owners of webpage's and URLs is difficult because changing URLs is easy. With accurate schedules, Athena could compare the full contact information with data from eBay and other online sellers to learn the suppliers' and customers' true identities.

The jury found that Schedule 1 did not include the full and complete contact information of defendants' suppliers, discrepancies in the amount defendants bought and sold were not caused by AMN's suppliers' inaccuracies. It also found defendants continued selling or marketing Athena cosmetics after the 2020 Agreement's effective

date. These acts are breaches that cause the agreement's release to be ineffective. Defendants, therefore, are liable for all counterfeit products sold before and after the 2020 Agreement's April 30, 2019, effective date.

### 3.   Facts establishing defendant Newman's joint liability.

Two sources establish Mr. Newman's liability. Jointly with AMN, he warranted the completeness of the 2020 Agreement's schedules and promised not to market or sell Athena products. But he also admitted under penalty of perjury, "In my capacity as CEO of AMN, I am responsible for the purchasing and selling of products, establishing new purchasing opportunities and developing new sales channels." (Newman Declaration, Dkt. 172, p. 3).[2]

## C.   ARGUMENT

### 1.   Summary Judgment Standards.

Moving party Athena must show "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Athena bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *C.A.R. Transp. Brokerage Co. v. Darden Restaurants, Inc.,* 213 F.3d 474, 480 (9th Cir. 2000) (holding the initial burden extends "to each issue material to its case.").

After Athena meets its initial burden, defendants must go beyond the pleadings, and, by their own affidavits or discovery, set forth specific facts showing that a genuine issue of fact exists for trial. FED. R. CIV. P. 56(c). A dispute about a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 258 (1986). Any opposition by defendants must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S.

---

[2] The first eight paragraphs of the declaration were read to the jury.

574, 586 (1986). Evidence of the nonmovant is to be believed, however, and justifiable inferences must be drawn in the light most favorable to the nonmoving party. *Tolan v. Cotton*, 572 U.S. 650, 651 (2014).

Defendants' refusal to produce evidence during discovery prevents them from introducing evidence against summary judgment. Their response to Athena's interrogatories and document requests (Harris Decl. Exs. 22 and 23) provided no evidence that could support their defense. Its only document production occurred August 24, 2021, when all they produced were photocopies of some eBay order confirmations, a lease for AMN's Pennsylvania warehouse and two emails from a Czech company (see Ex. 24, an exemplary sample from their document production). With defendant Newman in Australia and United States sales and employees, defendants must have maintained computerized records that they should have produced. Schedule 2, Ex. 3, was computer generated. Defendants also sell online through Brush Express and United States-based e-commerce stores like eBay, Groupon, and Walmart.com, and they were paid through PayPal. They could not have done business without being fully computerized.

Defendants also prevented Moishe Newman's deposition. AMN's FED. R. CIV. P. 30(b)(6) deposition was first scheduled for November 5, 2020. Harris Decl. ¶ 8 and Ex. 27. Ronan Cohen, AMN's counsel then, neither objected to the deposition nor otherwise told Athena's attorney Mr. Newman would not appear. Harris Decl. ¶ 9 and Ex. 28. No AMN witness appeared. Athena served two more Rule 30(b)(6) deposition notices after Mr. Voss became counsel. Defendant objected to both, so Athena chose to notice AMN under Rule 30(b)(1) through its CEO Mr. Newman. Ex. 29. He failed to attend. Harris Decl. ¶ 10.

Athena also noticed depositions of Dov, Devorah, and Nechemiah Newman, whom Moishe Newman identified as AMN employees. Harris Decl. ¶ 10. See Dkt. 172, "Declaration of Submitted Pursuant to Order of Trial Judge," which named the three as AMN employees. Athena could not serve them. Harris Decl. ¶ 12.

Any attempt by defendant to submit written evidence or a declaration of Moishe Newman, should not be entered. *Asus Comput. Int'l v. Round Rock Research, LLC*, No. 12-cv-02099 JST (NC), 2014 WL 1463609, at *6 (N.D. Cal. Apr. 11, 2014) (holding when a party fails to produce required discovery, a motion to strike under FED. R. CIV. P. 37 may be proper with the violating party having the burden of proving substantial justification and lack of prejudice.").

### 2.   Defendants breached their contract with Athena.

Athena established at the first trial that defendants breached the 2020 Agreement. Defendants moved for a judgment as a matter of law under FED. R. CIV. P. 50, and Athena's opposition shows why the motion should be denied.

### 3.   As AMN's "guiding spirit," Mr. Newman also is liable for defendants' infringement and counterfeiting.

Defendant Newman warranted the data in the two schedules were complete and accurate, and he promised to cease marketing and selling Athena products. Ex. 1, pp. 2–3. Therefore, he breached the 2020 Agreement. Without the release shielding Mr. Newman, he also is liable for the counterfeiting, trademark infringement and other torts. He admitted in his declaration he is "responsible for the purchasing and selling of products …." Dkt. 172, ¶ 7. "[A] corporate officer or director is, in general, personally liable for all torts which he authorizes or directs or in which he participates, notwithstanding that he acted as an agent of the corporation and not on his own behalf." *The Comm. for Idaho's High Desert, Inc. v. Yost*, 92 F.3d 814, 823 (9th Cir. 1996). "Cases which have found personal liability on the part of corporate officers have typically involved instances where the defendant was the 'guiding spirit' behind the wrongful conduct, … or the 'central figure' in the challenged corporate activity." *Davis v. Metro Prods., Inc.*, 885 F.2d 515, 525, n. 10 (9th Cir. 1989). That quote accurately describes Mr. Newman's activities as CEO. *See also* M*ead Johnson & Co. v. Baby's Formula Serv.*, 402 F.2d 19, 23 (5th Cir. 1968) ("[A] trademark … can be infringed by an individual. It is infringed when an individual performs the act or does

the things that the patent or trademark law protects against. The fact that the persons thus acting are acting for a corporation also, of course, may make the corporation liable under the doctrine of respondeat superior. It does not relieve the individuals of their responsibility.").

"A 'counterfeit' is a spurious mark which is identical with, or substantially indistinguishable from, a registered mark." 15 U.S.C. § 1127. Counterfeit goods are "knock-offs," copies made to look like authentic goods of a trademark owner, here Athena. They are not ordinary infringements where the trademarks or the goods may differ. *See e.g. Applied Info. Scis. Corp. v. eBay, Inc.*, 511 F.3d 966, 968 (9th Cir. 2007) (comparing mark SMARTSEARCH for different goods and services). Counterfeiters make products to look like a registered trademark owner's products because the counterfeiter wants consumers to buy its product instead of the trademark owner's legitimate product.

Counterfeit merchandise endangers Athena's business. Its presence causes brand erosion and reduced revenue. Because Athena's products are applied near the eyes—REVITALASH to the lids of eyelashes and REVITABROW to skin under the eyebrows—counterfeits can cause injuries to users with inferior ingredients. Felix Decl. ¶ 3. Counterfeiters do not care about such dangers because when customers are injured, they blame the trademark owner. Counterfeiters also hide their identities to escape discovery and liability. They typically trade in counterfeits across several brands to minimize the impact of any loss in consumer loyalty for any single counterfeit brand.

**4.   Four sources, (1) Christina Felix's declaration showing her "secret shopper" purchases, (2) Schedule 2, showing defendants sales, (3) defendants' low price and (4) defendants discovery refusals, confirm defendants sold Athena counterfeits.**

   **a.   Defendants sold Athena counterfeits which Christina Felix purchased.**

As Athena's Anti-Diversion Manager, Christina Felix investigates counterfeit Athena goods that copy registered Athena Trademarks. Her declaration describes the business strategies she uses to protect Athena from product counterfeiting. She shops for and purchases products online that are advertised and sold as authentic, genuine Athena cosmetic goods. Felix Decl. ¶ 8. Her standard business practices are: (1) save a copy of webpage listing from where she purchased the product, (2) save a copy of the proof of purchase of the product(s) from that webpage, (3) photograph the shipping label and product package when the item is delivered, (4) photograph the package contents, and save the package and its contents, (5) analyze the products inside to determine if they are counterfeit, (6) update the counterfeit purchase log she maintains, and secure the evidence. *Id.*



Ms. Felix visited Brush Express's website www.brushexpress.com in November 2019, took a screen shot of the webpage (Ex. 4–reproduced to the

1   left), and purchased three units of REVITALASH Eyelash Conditioner.[3] Felix Decl. ¶
2   10–12.

3       Exhibit 5, reproduced below, shows the screen capture of her receipt for the
4   purchase. It also displays her handwritten notes, which says, "Counterfeit." Felix
5   Decl. ¶ 11.

6

7
8   
9
10
11                                                              
12
13
14
15
16

17       The products Ms. Felix ordered from brushexpress.com arrived in a box. Ex-
18   hibit 6 is her photograph of the return label on the box, which is shown on the next
19   page. The return address label states: "Brush Express, Shipping Department, 10 Gal-
20   lagher Dr, Suite C, Plains PA 18705." Ms. Felix covered over her home address in the
21   exhibit for privacy but did not change the return address.

22
23
24
25
26
27   _____
     [3] The red circle around "RevitaLash" was added to Exhibit 4, and Ms. Felix wrote "counterfeit" on
28   Exhibit 5.



**F**

FIRST-CLASS PKG SVC

All Athena products Ms. Felix bought from Brush Express were counterfeits. Felix Decl. ¶ 16. She based her conclusion on these facts:

Athena products contain anti-diversion tracking technology, but those from Brush Express do not. Athena prints its lot code on all its products. If a customer has a problem with a product, Athena can determine the product's lot. The Brush Express counterfeits use a falsified lot code. Below is a photograph of a counterfeit Ms. Felix took displaying the fake lot code.[4] Felix Decl. ¶ 14.



---

[4] The words "authentic," "counterfeit," or "Brushexpress.com" were added to photographs.

1        Athena uses state-of-the-art, custom, machine-glued, seamless, adhesive pack-

2   aging for its containers, which is important to protect the goods sensitive components

3   during shipment and ensure they are not subject to tampering. The containers from

4   Brush Express were sloppily taped with clear 3/4 Scotch by hand as shown below:



10        Athena also uses a custom shade of blue for its boxes, but the counterfeits use a

11   different shade of blue. Below and to the left is Ms. Felix's photograph of a counter-

12   feit purchased from brushexpress.com displayed next to an authentic Athena box that

13   shows the color difference. The authentic box is shown on the left; the counterfeit is

14   on the right. *Id.*





26        Each box of Athena product contains a small, folded booklet, which includes

27   directions for use and cautions. The photograph above and to the right shows the in-

28   ternal booklet in the Brush Express counterfeit box is folded differently from

Athena's. Brush Express's instructions also contains Chinese characters off to one side, which Athena does not have. *Id.*

The Brush Express counterfeits have a thicker wand and brush than Athena's genuine goods. Ms. Felix took the photograph which compares a genuine Athena wand and brush with the counterfeit's thicker wand and brush. She used that thickness to determine the wand and brush on the right are counterfeit. *Id.*



### b.   Schedule 2 to the 2020 Agreement admits defendants' counterfeit sales in 2019.

The 2020 Agreement required Schedule 2 of the 2020 Agreement to state the "aggregate amount of product sold or otherwise delivered" in 2019. Ex. 1, p. 3. Adding the sales in Schedule 2 yields 4,474 units sold during 2019. Defendants has no evidence the products came from Athena or Athena's authorized distributors.

During discovery, an Athena document requests asked for "All communications including emails and letters with all suppliers or potential suppliers of Athena Goods. Harris Decl. Ex 23, pp 9–10. Defendants produced nothing; they objected to the request in full. *Id.,* pp. 10–11. Their interrogatory responses do not help them. Interrogatory No. 4 asked, "State the name, street and email address and telephone num-

bers for all Persons that provided AMN with any product bearing an Athena Trademark. If the Person is a natural person, also state his or her employer and its street and email address and telephone numbers." Harris Decl., Ex. 23, p. 6. After protracted objections, defendants responded, "The information that AMN was contractually obligated to provide to Athena with respect to the source of Athena products was previously provided to Athena as Schedule 1 to the settlement agreement (the 'Settlement Agreement') that is the basis for Athena's breach of contract claim in the above-captioned action. ¶ The Persons identified in Schedule 1 are a complete list." *Id.* p. 8.

### 5. Defendant sold at least 4,474 counterfeit Athena products.

The calculations of Schedules 1 and 2 of the 2020 Agreement are inaccurate. Defendants claim to have purchased 2,835 units during 2019. According to their Schedule 2, they sold 4,474 units during 2019. Their 2019 Revenue totaled $312,880. This chart, Felix Decl. ¶ 18, shows how she determined the units they sold and their revenue.

| Product | Qty | Revenue |
|---|---|---|
| REVITALASH Advanced 3.5 mL and REVITABROW Advanced Eyebrow Conditioner 1.5mL (KIT) | 11 | $ 631 |
| REVITALASH Eyelash Conditioner 3.5 ml / 0.118 oz | 2,567 | $192,792 |
| REVITALASH Eyelash Conditioner, 2.0ml/0.06oz | 1,199 | $69,817 |
| REVITALASH REVITABROW Advanced Eyebrow Conditioner3ml/0.1oz | 133 | $9,131 |
| REVITALASH REVITABROW Advanced Eyebrow Conditioner, 0.101oz | 564 | $40,510 |
| **Grand Total** | **4,474** | **$312,880** |

**6. Defendants are liable for three-times their actual profits and statutory damages up to $2 million per infringed mark.**

    **a. The statute provide defendants are liable for three-times their actual profits plus attorney fees.**

*Treble damages for use of counterfeit mark.* In assessing damages under subsection (a) for any violation of section 1114(1)(a) of this title …, in a case involving use of a counterfeit mark or designation (as defined in section 1116(d) of this title), the court *shall, unless the court finds extenuating circumstances*, enter judgment for three times such profits or damages, whichever amount is greater, together with a reasonable attorney's fee, if the violation consists of

    (1) intentionally using a mark or designation, knowing such mark or designation is a counterfeit mark (as defined in section 1116(d) of this title), in connection with the sale, offering for sale, or distribution of goods or services; or

    (2) providing goods or services necessary to the commission of a violation specified in paragraph (1), with the intent that the recipient of the goods or services would put the goods or services to use in committing the violation.

15 U.S.C. § 1114(1)(a) (emphasis added). The Court also may award prejudgment interest. 15 U.S.C. §1117(a).

Defendants' stated revenue for selling Athena products during 2019 was $312,880. Gross revenue here equal profits because defendants produced no evidence of their expenses.

The 2020 Agreement was not effective until the end of April 2020 so the revenue from Schedule 2 lacks January through April, i.e., one third of 2020 and all post-settlement sales. If sales continued at the same rate during the first, four months of 2020, defendants' revenue would have been $104,293. Since defendants objected to

providing books and records of all sales, finding the revenues to be $417,173 ($312,880 + $104,293) is reasonable.

"[T]rial courts need not, and indeed should not, become green-eyeshade accountants." *Fox v. Vice*, 563 U.S. 826, 838 (2011) (context of calculating attorney fee award). The Court approved doing "rough justice, not to achieve auditing perfection." *Id.* Defendants should not escape paying more just because they refused failure to provide sales records.

Courts agree. Defendants in *Louis Vuitton S.A. v. Spencer Handbags Corp.*, 765 F.2d 966, 972 (2d Cir. 1985), denied selling any counterfeit items and refused to produce any records. The court held defendants must bear the burden of uncertainty. *Skydive Ariz., Inc. v. Quattrocchi*, 673 F.3d 1105, 1113 (9th Cir. 2012), cited *Louis Vuitton* with approval. *Skydive* also mentioned the Ninth Circuit's "willingness to accept 'crude' measures of damages in cases of intentional infringement." *Id. See also Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 265 (1946) (holding "wrongdoer shall bear the risk of the uncertainty which his own wrong has created" by allowing a reasonable estimate of damages when defendant prevents a more precise computation.).

### b. The statute requires treble damages.

"Under 15 U.S.C. § 1117(b), unless there are extenuating circumstances, a court must award treble damages for intentionally using a counterfeit mark." *Moroccanoil, Inc. v. Groupon, Inc.*, 278 F. Supp. 3d 1157, 1164 (C.D. Cal. 2017). $417,173 x 3 = $1,251,519. Even ignoring the sales attributed sales after 2019, $312,880, treble damages are $938,640.

To obtain treble damages, Athena must prove defendants "intentionally us[ed] a mark or designation, knowing such mark or designation is a counterfeit mark…." 15 U.S.C. § 1117(b)(1). No other conclusion is possible. Defendants copied Athena's box and applicator and intentionally duplicate all the Athena Trademarks.

### c. Defendants' low price is strong evidence defendants' products were counterfeit, and they knew they were selling counterfeits.

Ms. Felix's declaration and the chart on page 14 of this brief show defendants' selling prices were at half of Athena's list prices. Felix Decl. ¶ 19. Defendants claim to have sold 2,567 units of their best seller, REVITALASH Eyelash Conditioner 3.5 ml / 0.118 oz, for $192,792, or $75.10 per unit. Athena sells the genuine version at the price of $150 per unit. Felix Decl. ¶ 19. Exhibit 4 shows another size Athena product. Athena's list, according to the Brush Express webpage, is $90; defendants' price $64.99, is less than three-fourths of list. Defendants only could sell products for half or three-fourths of Athena's price if they are counterfeit.

Abnormally low prices are evidence of counterfeiting. *See Louis Vuitton S.A. v. Lee*, 875 F.2d 584, 589 (7th Cir. 1989) (retailer selling Vuitton and Gucci purses well below normal retail price found to be counterfeiter); *Hard Rock Cafe Licensing Corp. v. Concession Serv., Inc.*, 955 F.2d 1143, 149 (7th Cir. 1992) (holding defendant's willful blindness that goods were counterfeit "is equivalent to actual knowledge for purposes of the Lanham Act…."); *Screen Gems-Columbia Music, Inc. v. Mark-Fi Records, Inc.*, 256 F. Supp. 399, 404 (S.D.N.Y. 1966) (holding a suspiciously low price allows an inference of constructive knowledge of the illegitimacy of the product); *Keds Corp. v. Goldstreet Holdings Inc.*, 92 -2950 SVW (KX), 1992 WL 456626, at *5 (C.D. Cal. Aug. 14, 1992), *aff'd w/o opinion*, 19 F.3d 27 (9th Cir. 1994) (finding of willful infringement based on counterfeiter's low price).

The prices defendants charged also had to alert defendants they were willful dealers in counterfeits products.

### d. Defendants' failure to cooperate in discovery also evidences their hiding their counterfeiting.

Had defendants been a legitimate seller of Athena goods, it would have produced its books and records willingly because it had nothing to hide. Instead, it made every effort to conceal what it did and was continuing to do.

**7.   Defendants also are liable for statutory damages up to $2 million for each of the nine Athena trademarks they counterfeited.**

The Lanham Act has a special provision for statutory damages in counterfeiting cases. "[I]f the court finds that the use of the counterfeit mark was willful, [it may award] not more than $2,000,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just." 15 U.S.C. § 1117(c)(2). The undisputed evidence establishes defendants' willfulness.

Defendants' maximum liability for infringing nine Athena trademarks is $18 million. The photographs below show defendants' copied at least nine Athena Trade-marks on the sides of defendants' counterfeit box and on the counterfeit products. The red arrows point to Athena trademarks, and the numbers in red are the last three digits of each trademark's registration number.

 



The photocopies below show both sides of the booklet inserted into the box of a counterfeit of defendants. The booklet uses the marks, REVITALASH ADVANCED at the top of each column and Athena Cosmetics logo at the left end of the bottom page:





A preliminary issue about statutory damages: is the amount a court or jury issue? 15 U.S.C. § 1117(c)(2), the statute authorizing statutory damages up to $2 million, ends with "as the court considers just," which implies the amount awarded is a Court issue. But a case of statutory damages under the Copyright Act, *Feltner v. Columbia Pictures TV, Inc.*, 523 U.S. 340, 353 (1998), held parties have a right to a jury trial on the statutory damages issue.

This case is different because the liability issues already will have been decided on summary judgment. Empaneling a jury just for determining the amount of statutory damages is unwieldy.

Athena's counsel asked defense counsel for his agreement on the jury/judge issue, but he did not respond.

**8. Defendants also are liable for attorney fees under the Lanham Act and under a clause of the 2020 Agreement.**

**a. The Lanham Act provides for an automatic attorney fee award in counterfeiting cases like this one.**

Unless the court finds "extenuating circumstances," 15 U.S.C. § 1117(b) mandates an award of a "reasonable attorney's fee" where the defendant knowingly sells counterfeits. "'[E]xtenuating circumstances' is not defined in the Lanham Act. However, the exception is extremely narrow." *Levi Strauss & Co. v. Shilon*, 121 F.3d

1309, 1314 (9th Cir. 1997) (finding no extenuating circumstances where defendant offered but did not sell counterfeit good and claimed to be entrapped by Levi's investigator to sell the goods). Defendants here have no evidence of extenuating circumstances.

If Athena recovers statutory damages, it may have to show the case is "exceptional" to recover its attorney fees. *See* 15 U.S.C. § 1117(a) ("The court in exceptional cases may award reasonable attorney fees to the prevailing party."). In *K&N Eng'g, Inc. v. Bulat*, 510 F.3d 1079 (9th Cir. 2007), the court held a plaintiff cannot obtain both statutory damages under Section 1117(c) and attorney fees under Section 1117(a). But *K&N* from 2007 predates the 1984 amendment to the Lanham Act, which added, "The court in exceptional cases …." Act Jan. 2, 1975, P.L. 93-600. The court in *Chloe SAS v. Sawabeh Info. Serv. Co.*, 11-cv-4147-MMM (MANx), 2015 WL 12763541, at *12–13 (C.D. Cal. June 22, 2015), held a plaintiff electing statutory damages could obtain attorney fees in exceptional cases.[5]

The Supreme Court defined "exceptional" as "stand[ing] out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014). *Octane Fitness* was a patent case. In *SunEarth, Inc. v. Sun Earth Solar Power Co.,* 839 F.3d 1179, 1180 (9th Cir. 2016), the Ninth Circuit applied the "exceptional case" standard from patent law into the Lanham Act, trademark cases.

A trademark case is exceptional where the infringement is "'malicious," 'fraudulent," 'deliberate," or 'willful.'" *Playboy Enterp., Inc. v. Baccarat Clothing Co.,* 692 F.2d 1272, 1276 (9th Cir. 1982) (case exceptional where "defendants deliberately arranged to obtain counterfeit goods and to sell such goods as genuine [Playboy] products," "premeditatedly sought the services of [a manufacturer] to produce counterfeit

---

[5] There are district court cases in this circuit that do not follow the holding in *Chloe SAS*, however.

PLAYBOY and RABBIT HEAD insignias and upon receiving such goods sold them as legitimate [Playboy] products").

Not only did defendants act similarly to the *Playboy* defendant, but they also avoided discovery by refusing to produce their books and records, and they hid defendant Newman from his noticed deposition. The case is exceptional.

### b.   Defendants also are liable for attorney fees under the 2020 Agreement.

The 2020 Agreement provides "In the event of any litigation arising from breach of this Agreement, the prevailing party shall be entitled to recover from the non-prevailing party all reasonable costs incurred including staff time, court costs, and attorney's fees." Ex. 1, pp. 7–8. If the court holds Athena cannot recover statutory damages and attorney fee simultaneously, Athena can rely on this clause for attorney fees.

### c.   Athena will detail its right to attorney fees and their amount in a motion under FED. R. CIV. P. 54(d)(2) following entry of judgment.

Rule 56(d)(2) requires any award of attorney fees must be brought by motion within 14 days of entry of judgment. Athena will comply with that deadline if the court grants this motion.

### 9.   Athena is entitled to a permanent injunction against infringement and counterfeiting.

Permanent injunctions against infringement and counterfeiting are appropriate remedies in counterfeiting lawsuits. "A plaintiff seeking any such injunction shall be entitled to a rebuttable presumption of irreparable harm upon a finding of a violation identified in this subsection in the case of a motion for a permanent injunction." 15 U.S.C. § 1116(a) (added in P.L. 116-260, 134 Stat. 2208 (Dec. 27, 2020)). The amendment eliminated the requirement from *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006), of a trademark plaintiff proving irreparable harm. Defendants have no evidence or argument to rebut the presumption of irreparable harm.

The proposed injunction is included in the proposed judgment filed with this motion.

**D.   CONCLUSION**

Now that the conditional release in the 2020 Agreement has no effect, the contract does not save defendants from their counterfeiting liability. Schedule 2 admits over $300,000 revenue from selling counterfeits, and Christina Felix's declaration confirms defendants sold counterfeit Athena products. Defendants have no contrary evidence to create any material factual issues. Moishe Newman, AMN's guiding spirit, also is liable for all Athena remedies.

Athena requests that the court grant summary judgment in Athena's favor.

December 15, 2021

_/s/ Michael Harris_
Michael D. Harris
SoCal IP Law Group LLP

Attorneys for Plaintiff Athena Cosmetics, Inc.