Michael D. Harris, No. 59,470 mharris@socalip.com
Marina Lang, No. 251,087 mlang@socalip.com
Brian Tamsut, No. 322,780, btamsut@socalip.com
SoCal IP Law Group LLP
310 N. Westlake Blvd., Suite 120
Westlake Village, CA 91362-3788
Phone: (805) 230-1350 • Fax: (805) 230-1355

Attorneys for Plaintiff Athena Cosmetics, Inc.

## UNITED STATES DISTRICT COURT

### CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| Athena Cosmetics, Inc.,<br><br>    Plaintiff,<br><br>        v.<br><br>AMN Distribution Inc., et al.,<br><br>    Defendant. | Case No. 2:20-cv-05526-SVW-SHK<br><br>Marina Lang's Response to Order to Show Cause Re: Civil Contempt<br><br>Hearing Date: January 24, 2022<br>Time: 1:30 p.m. |

### TABLE OF CONTENTS

A.  Introduction.................................................................................................. 1

  1.  Recusal is Mandatory........................................................................... 1

  2.  The Court Should Not Find Attorney Lang in Contempt Because: (1) She Was Already Sanctioned with Incarceration and thus No Further Sanctions are Warranted, and (2) She was Deprived Due Process, which is an Independent Reason to Vacate any Finding of Contempt. ........................................... 2

B.  Argument ..................................................................................................... 4

  1.  Attorney Lang's Unlawful Incarceration............................................. 9

  2.  The Court Violated Attorney Lang's Due Process Rights ............................ 23

C.  Conclusion ................................................................................................. 25

## TABLE OF AUTHORITIES

**Cases**

*Ahearn v. Int'l Longshore & Warehouse Union*, 721 F.3d 1122 (9th Cir. 2013) ......... 6

*Cobell v. Norton*, 334 F.3d 1128 (D.C. Cir. 2003) ........................................ 8

*F.J. Hanshaw Enters. v. Emerald River Dev., Inc.,* 244 F.3d 1128
    (9th Cir. 2001) ........................................................................ 1

*Falstaff v. Miller Brewing Co.*, 702 F.2d 770 (9th Cir. 1983) ........................ 8, 9

*Gates v. Shinn*, 98 F.3d 463 (9th Cir. 1996) ........................................ 6, 24

*Gompers v. Buck Stove & Range Co.*, 221 U.S. 418 (1911) ..................... 5, 6, 7, 23, 24

*Hicks v. Feiock*, 485 U.S. 624 (1988) ................................................ 5, 6

*In re Kave*, 760 F.2d 343 (1st Cir. 1985) ............................................. 9

*In re Murchison*, 349 U.S. 133 (1955) ................................................. 1

*In re Olson*, 202 Fed. Appx. 210 (9th Cir. 2006) ...................................... 8

*Int'l Longshoremen's Ass'n v. Philadelphia Marine Trade Ass'n*, 389
    U.S. 64 (1967) ................................................................... 6, 24

*Int'l Union v. Bagwell*, 512 U.S. 821 (1994) ........................................ 8, 23

*Jake's, Ltd. v. City of Coates*, 356 F.3d 896 (8th Cir. 2004) ........................ 9

*Latrobe Steel Co. v. United Steelworkers of Am.*, 545 F.2d 1336
    (3d Cir. 1976) .................................................................. 4, 5

*Little v. Kern County Superior Court*, 294 F.3d 1075 (9th Cir. 2002) .................. 24

*Maggio v. Zeitz*, 333 U.S. 56 (1948) ................................................... 5

*Nye v. United States*, 313 U.S. 33 (1941) .............................................. 5

*Offutt v. United States*, 348 U.S. 11 (1954) ......................................... 24

*Reno Air Racing Ass'n, Inc. v. McCord*, 452 F.3d 1126 (9th Cir. 2006) ................. 7

*SEC v. ACI Inv'rs Protective Ass'n*, No. 95-56644 (9th Cir. Oct. 22, 1996) ............ 5

*Taylor v. Hayes*, 418 U.S. 488 (1974) ................................................ 25

*Turner v. Rogers*, 564 U.S. 431, 180 L.Ed.2d 452 (2011) ............................... 5

*United Mine Workers of Am. v. Bagwell*, 512 U.S. 821 (1994)..................................... 3

*Vertex Distr., Inc. v. Falcon Foam Plastics, Inc.*, 689 F.2d 885 (9th Cir. 1982) .......... 7

*Withrow v. Larkin*, 421 U.S. 35 (1975).......................................................................... 1

**Statutes**

28 U.S.C. § 455(a)........................................................................................................... 1

### A. Introduction

#### 1. Recusal is Mandatory

Judge Wilson must recuse himself from this contempt proceeding which calls for him to "judge his own actions" regarding his unprecedented contempt sanction on November 17, 2021, including the arrest, shackling, and solitary confinement of Attorney Marina L. Lang, to vindicate the Court's authority. The Court's sanction deprived Attorney Lang of due process and other constitutional rights and, per the United States Supreme Court, "no man can be a judge in his own case", adding that "no man is permitted to try a case where he has an interest in the outcome." *In re Murchison*, 349 U.S. 133, 136 (1955). Our long-standing precedents require recusal when "the probability of actual bias on the part of the judge or decision-maker is too high to be constitutionally tolerable." *Withrow v. Larkin*, 421 U.S. 35, 43 (1975). When, as here, the trial court is the accuser, the need for procedural protections "becomes all the more important…Even if judges are able to separate their roles as accuser and fact finder, which is undeniably difficult, it would still *appear* to the accused as fundamentally unfair." *F.J. Hanshaw Enters. v. Emerald River Dev., Inc.,* 244 F.3d 1128, 1140–41 (9th Cir. 2001) (emphasis in original).[1] The law mandates Judge Wilson recuse and disqualify himself from the instant proceeding and from this case. Compounding the Court's error, civil contempt is a remedy available only to a party in an action, not to the Court itself. The United States government cannot use civil contempt for law enforcement or to compel payments on their own motion.

---

[1] A judge may recuse *sua sponte* under 28 U.S.C. § 455(a), which provides: "any justice, judge, or magistrate of the United States **shall** disqualify himself in any proceeding in which his impartiality might reasonably be questioned." (emphasis added).

**2. The Court Should Not Find Attorney Lang in Contempt Because: (1) She Was Already Sanctioned with Incarceration and thus No Further Sanctions are Warranted, and (2) She was Deprived Due Process, which is an Independent Reason to Vacate any Finding of Contempt.**

Attorney Lang has represented the plaintiff for over a decade, and she has over-seen plaintiff's prosecution efforts against counterfeiters since the plaintiff first discov-ered an influx of counterfeit goods being sold on e-commerce platforms starting in 2019. (Lang Decl. ¶4). Attorney Lang has practiced federal trademark law and com-plex federal litigation throughout the United States, primarily before the Central Dis-trict, going on fourteen (14) years. (Id. ¶5). She has been LEAD COUNSEL in nearly fifty (50) lawsuits, most of them before the Central District, and she has never been warned with, much less cited with, any form of contempt during her career, nor has she ever been incarcerated, handcuffed, or jailed prior to Judge Wilson's ordering her ar-rested, shackled, and imprisoned in an isolated and locked prison cell on November 17, 2021. (Id. ¶5). At approximately 3:24 pm on November 17, 2021, while performing her trade as LEAD COUNSEL for the plaintiff in accordance with the duty of zealous advocacy, in violation of no court order, during a civil trial deciding whether the de-fendants, known counterfeiters, breached their agreement with plaintiff to reveal their sources and stop selling goods, the Court *sua sponte* ordered that Attorney Marina L. Lang be arrested and taken into custody. *See* Trial Tr. 117: 1-25. As instructed by the Court, several armed US Marshalls swiftly marched over to counsel's table where At-torney Lang was sitting, had her stand and be handcuffed, at which point she told the Court she would leave on her own accord, allowing her co-counsel to finish the trial without her. *See* Trial Tr. 117: 3-8. Attorney Lang told the Court she couldn't be ar-rested because she has a baby at home. *See* Trial Tr. 116: 22-25. The Court still had her arrested, shackled, and locked away in an isolated prison cell for the remainder of the day. (*See* Trial Tr. 117: 1-19; 144:14-19). After the marshals removed her, physical restraints, universally known in criminal law as "hogtie" or "hobble" restraints, were

applied to Attorney Lang's wrists, legs, and waist, and they wouldn't be removed until day's end. (See Lang Decl. ¶¶7-8). Prisoner Lang repeatedly asked why such aggressive physical restraints were being used, and the marshals said they were following Judge Wilson's orders and that this was standard practice to protect prisoners from hurting themselves. (See Lang Decl. ¶10).

Admitting he was taking "extreme action" that "happened only once before in 35 years" (*Id* at 117:24-25), the Court stated "criminal contempt" was "more than justified" here. *Id* at 143:15-21; 145:3. The Court's colloquy wasn't accompanied by any further explanation, and Attorney Lang would remain locked up for the remainder of the day, not even present to hear or defend herself against the Court's degrading personal comments about her.  *Id* at 143:11-145:8; 118:12-119:15; 147:8-148:11. The Court also had Attorney Lang removed from the Service List, forcing her to obtain a copy of the trial transcript and other post-trial case filings from other sources. (See Lang Decl. ¶9).

Attorney Lang was incarcerated without due process and without having committed a crime. Realizing its mistake too late and long after the irreparable damage to Attorney Lang was done, the Court now backpaddles and erroneously attempts to "re-characterize" its contempt sanction as civil. But it's undeniable the sanctions imposed were punitive, and the Court's failure to observe appropriate due process procedures is an independent reason to vacate the OSC. *United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 826 (1994) ("'[C]riminal penalties may not be imposed on someone who has not been afforded the protections that the Constitution requires of such criminal proceedings,'" including those charges be proved beyond a reasonable doubt.).

The Court did not have sweeping jurisdiction to arrest, physically restrain, shackle, and imprison Attorney Lang in an isolated cell, solitarily confining her indefinitely while she awaited news of her uncertain fate. The Court's actions were dehumanizing, cruel and unusual, and they caused Attorney Lang to suffer physical injury, feel extreme helplessness, fear, injustice, powerlessness, and uncertainty. (See Lang

Decl. ¶6). Attorney Lang considers the experience to be one of the most traumatic events in her life. (See Lang Decl. ¶5). Any further sanction against Attorney Lang by the Court is wholly unwarranted. Legal research uncovered no other attorney in known judicial history subjected to such retribution for civil contempt. (See Lang Decl. ¶14). Likely because it reflects such a departure from ordinary practice, legal research found no attempt by a court in this Circuit to impose anything close to the unprecedented nature of Court's action's here. (Id.).

The Court's conduct radically departs from well-established principles of contempt and exceeds the limits on judicial authority. Indeed, the Court's personal hostility toward Attorney Lang infected its appraisal of the case and this animus was manifested in the Court's extraordinary and unwarranted arrest and incarceration of her. The Court overstepped its authority.

Judicial contempt is a potent weapon. Contempt sanctions are valid only if founded on violating a clear injunction with civil contempt, or on proof beyond a reasonable doubt of intent to subvert the court's jurisdiction, in criminal contempt. No elements of a contempt order are present here. The Court had no jurisdiction to destroy Attorney Lang's liberties the way it did.  The Court never had authority to bar Attorney Lang from her occupation. The time for the Court to properly notice and impose proper equitable remedies for civil contempt, like a money sanction, assuming arguendo that civilly contemptuous conduct existed, has long passed now. The multiple layers of illegal and unconstitutional actions against Attorney Lang render a contempt finding unconstitutional, void, and unenforceable.

**B.    Argument**

Contempt proceedings are civil, criminal, or have attributes of both. *Latrobe Steel Co. v. United Steelworkers of Am.*, 545 F.2d 1336, 1342 (3d Cir. 1976). Criminal contempt "is a crime in the ordinary sense" and triggers the constitutional protections which accompany typical criminal proceedings. *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 826 (1994). A contempt sanction is criminal if its

"character and purpose" display indicators of punishment. *Bagwell*, at 828; *See also, Gompers v. Buck's Stove & Range Co.*, 221 U.S. 418, 441 (1911); *Hicks v. Feiock*, 485 U.S. 624, 631 (1988). Courts use the term "remedial" to describe civil contempt, in that it acts as a remedy - to provide some benefit to a <u>private party.</u> *Gompers*, at 441 ("private party" interlineated). It is supposed to be coercive, that is, to induce a party to do something that is capable of being done. *Id*. Criminal contempt sanctions are intended to vindicate authority. *Gompers*, at 441. If both criminal and civil relief are imposed in the same proceeding, "the criminal feature is dominant and fixes its character for purposes of review." *Hicks*, at 63 8, n. 10 (*quoting Nye v. United States*, 313 U.S. 33, 43 (1941).

A contemnor has to be able to avoid the sanction by agreeing to comply with the original order, or else, the proceeding cannot retain the civil character. *Hicks*, at 633, n.6. "Punishment may not be imposed in a civil contempt matter when it is clearly established that the alleged contemnor is unable to comply with the terms of the order." *Hicks*, at 638, n.9. Courts should employ special procedures to prevent the equivalent of debtor's prison, *Turner v. Rogers*, 564 U.S. 431, 180 L.Ed.2d 452 (2011), to prevent "blind[ness] to the evidence that compliance with an order is impossible." *U.S. v. Rylander*, 460 U.S. at 757. Otherwise, the proceeding becomes "purely punitive, to describe it charitably." *Maggio v. Zeitz*, 333 U.S. 56, 73 (1948). The district court's "mere characterization or label" of "civil contempt" is not binding on a reviewing court. *Latrobe Steel,* 545 F.3d at 1342.

The United States government cannot use civil contempt for law enforcement. The district courts do not have jurisdiction to compel civil payments on their own motion. There is no private party here that has moved for civil contempt. Compounding the Court's due process errors, this Court now improperly seeks civil contempt as a governmental remedy, when the remedy for civil contempt is a remedy available only to a party in an action, not to the Court itself. *SEC v. ACI Inv'rs Protective Ass'n*, No. 95-56644 (9th Cir. Oct. 22, 1996) ("Civil contempt is a remedy available only to a

party in an action, not to the court itself.") (unpublished). The *Hicks* court cited *Gompers* and other older cases that incorporate the traditional description of criminal contempt as "vindicatory" and provide a dispositive framework. Again, the United States government cannot use civil contempt for law enforcement. Even if the Court had the power, the Court applied the wrong standard of proof, stating that the burden for it is clear and convincing. Because the supposedly contemptuous acts occurred in the past and the sanctions imposed were criminal, proof beyond a reasonable doubt is required.

"A party moving for civil contempt must prove that the non-moving party has violated a court order by clear and convincing evidence." *Ahearn v. Int'l Longshore & Warehouse Union*, 721 F.3d 1122, 1129 (9th Cir. 2013). The "potent weapon" of contempt sanctions may not be "founded upon a decree too vague to be understood." *Int'l Longshoremen's Ass'n v. Philadelphia Marine Trade Ass'n*, 389 U.S. 64, 76 (1967). This Circuit has consistently held that "[c]ivil contempt is appropriate only when a party fails to comply with a court order that is both specific and definite." *Gates v. Shinn*, 98 F.3d 463, 472 (9th Cir. 1996) (quotations omitted). No court order here restricted the conduct of the attorneys before or during trial. Without such an order, the civil contempt finding cannot stand. Likely because it reflects such a departure from ordinary practice, legal research found no attempt by a court in this Circuit to impose anything close to the unprecedented nature of Court's action's here. (Lang Decl. 16). The Court was out to get Attorney Lang from the beginning of the trial, as evidenced by the trial transcript, potent excerpts from which are detailed below. If the Court felt Attorney Lang was talking over the Court or not respecting the Court, the Court could have issued monetary sanctions. But the Court's extraordinary and unwarranted arrest and incarceration of Attorney Lang is outrageous. Never before or during trial did the Court issue an order defining prohibited or required conduct. Despite the absence of a preliminary injunction or other order, the Court, acting *sua sponte*, initiated these contempt proceedings because Attorney Lang's actions were intended to interfere with ongoing litigation. First, a civil contempt sanction may be founded only on clear and

convincing evidence that the contemnors violated a definite and specific court order. Here, no order was in place. Second, the Court imposed punitive, criminal sanctions for completed conduct without providing the procedural protections for criminal contempt.

The court of appeals has vacated contempt findings when the trial court fails to specify with "sufficient specificity" the retrained acts. *Reno Air Racing Ass'n, Inc. v. McCord*, 452 F.3d 1126, 1133–34 (9th Cir. 2006); *see also Vertex Distr., Inc. v. Falcon Foam Plastics, Inc.*, 689 F.2d 885, 889 (9th Cir. 1982); cf. Fed. R. Civ. P. 65(d) (an injunction must be "specific in terms" and describe "in reasonable detail" the acts sought to be restrained).  These decisions follow the holding of *International Longshoremen*, which reversed a civil contempt judgment. In that case, the Supreme Court explained that because the lower court's order referred to an arbitrator's award that contained conclusions of law but not "an operative command capable of 'enforcement,'" the order was impermissibly vague, and "with it must fall the [lower court's] decision" finding in contempt. 389 U.S. at 73–74, 76. Here, the Court based its contempt order on something far less "specific and definite" than the ambiguous decrees analyzed in *Gates*, *Reno Air*, and *International Longshoremen*. It found contempt absent any specific order.

The label affixed to a proceeding does not determine the class of contempt. *Gompers v. Buck Stove & Range Co.*, 221 U.S. 418 (1911). Rather, the "character and purpose" of the punishment "often serve to distinguish between the two classes." *Id*. at 441. Civil contempt coerces the contemnor "to do the thing required by the order for the benefit of the complainant." *Id*. at 442. The ability to "purge" is a critical feature of a civil contempt order. To use the classic example, a contemnor who is imprisoned until he complies with the applicable court order "'carries the keys of his prison in his own pocket.' He can end the sentence and discharge himself at any moment by doing what he had previously refused to do." *Id.* at 442. Criminal contempt is not focused on coercing future compliance; rather, it punishes and vindicates the authority of the court

following a transgression. A criminal contempt sanction is "imposed retrospectively, for a 'completed act of disobedience.'" *Int'l Union v. Bagwell*, 512 U.S. 821, 828 (1994). In such a situation, the contemnor "cannot avoid or abbreviate the confinement through later compliance." *Id.* 829. Where "a judgment of contempt contains an admixture of criminal and civil elements, 'the criminal aspect of the order fixes its character for purposes of procedure on review.'" *Falstaff v. Miller Brewing Co.*, 702 F.2d 770, 778 (9th Cir. 1983). "Similarly, where the fine imposed is part compensation and part punishment, the criminal feature dominates and fixes its character for purpose of review." *Id.* 778–79; *see also In re Olson*, 202 Fed. Appx. 210, 211 (9th Cir. 2006) ("Even if the sanction was meant not only to punish the violation of the relevant order but also to inspire compliance with future orders, the citation is treated as if it were wholly criminal in nature.").

The "character and purpose" of the punishment imposed by the court render the sanctions criminal. Further, the court's finding of interference with its jurisdiction is a criminal contempt finding aimed at vindicating the court's authority after a completed act of disobedience. *See Bagwell*, 512 U.S. at 828. Therefore, the nature of the punishment imposed was criminal, not civil. And the Court's strong rebuke of Attorney Lang's conduct throughout the trial and in pre-trial hearings suggests that the Court "intended the adjudication and accompanying opinion to serve as a reprimand." *Cobell v. Norton*, 334 F.3d 1128, 1146 (D.C. Cir. 2003). The Court admits this on the record (*See e.g.,* Trial Tr. 47: 3-14; 144:14-19 wherein the Court verbally admonishes Attorney Lang's stating: "We've had [a] number of hearings and conferences. Your conduct has been consistent; that is, that you don't listen to the questions I ask, and you proceed to answer them in the way you want to and not the question, and you make many extraneous statements. That was meddlesome"). The Court already imposed its sanctions, which were undeniably punitive, when he had Attorney Lang unlawfully incarcerated and imprisoned mid-trial. Also, the conduct of Attorney Lang that the Court found sanctionable, occurred in the past, which renders sanctions for civil contempt--

assuming they were even available in the first place--moot and unavailable. *See, e.g., Falstaff*, 702 F.2d at 779 (contempt fines imposed for counsel's violation of a discovery order were punitive because Falstaff "could do nothing to change these past acts of disobedience by its attorneys…. Consequently, the district court's order could not have had the effect of coercing Falstaff to comply with its protective order.").

When a contempt judgment contains civil and criminal aspects, the trial court must provide criminal procedural protections. *Falstaff*, 702 F.2d at 778. Because Attorney Lang was criminally arrested and incarcerated, the sanctions imposed on her were predominantly punitive, and thus the court lacks authority to impose additional sanction in a civil proceeding. *See In re Kave*, 760 F.2d 343, 351–53 (1st Cir. 1985) (fine did not meet requisites of valid civil contempt fine, either as coercive or compensatory measure); *Jake's, Ltd. v. City of Coates*, 356 F.3d 896, 901–03 (8th Cir. 2004) (large, unconditional fine, imposed for completed rather than future conduct, constituted criminal contempt sanction, which could not be imposed without procedural protections).

Attorney Lang already served her unlawful sentence of "coercive confinement" and the Court's order to show cause, plus its recent ordering of a new trial, are solely meant to further retaliate against Attorney Lang, and instill further fear into her and other lawyers that come before the Court.

### 1. Attorney Lang's Unlawful Incarceration

Physically restrained in cuffs and flanked by several US Marshals, prisoner Lang was removed from the courtroom with none of her personal belongings, walked down the public hallways of the federal courthouse in plain view of other attorneys, her colleagues, and judicial staff, and then taken in and down the public elevator bank to the cellblock floor used for criminal defendants. (See Lang Decl. ¶10). At the cellblock floor, the US Marshals told prisoner Lang she had to go through the booking process. (See Lang Decl. ¶10). They led her to sit down on a chair while they questioned her to obtain personal information and then entered in her answers into their computer. After she was seated, the marshals applied additional physical restraints to

her body, restraints universally known in criminal law as "hogtie" or "hobble" re-
straints. (See Lang Decl. ¶10). She asked repeatedly why physical restraints were being
used and was told by the marshals they were following Judge Wilson's orders and this
was standard practice to protect prisoners from falling and hurting themselves. (See
Lang Decl. ¶10). The marshals told prisoner Lang to stop crying and do as she was told
if she wanted to get back to her family tonight and not have to sleep in her prison cell.
(See Lang Decl. ¶10). Leg irons were applied besides the handcuffs, with a waist chain
connecting prisoner Lang's leg irons to the handcuffs. (See Lang Decl. ¶10). Another
chain was wrapped around her chest near her collar bone and locked behind the chair
she was sitting in, pinner her shoulders and upper body to the back of chair. (See Lang
Decl. ¶10). Attorney Lang was imprisoned for several hours without access to her
physical liberties, any sense of time, any indication of what she had been arrested for,
or any idea how long she would be imprisoned. (See Lang Decl. ¶10). Attorney Lang's
"hogtie" or "hobble" restraints were not removed, even after she was placed inside of a
locked prison cell with armed guards monitoring her locked cell. (See Lang Decl. ¶10).
The only physical movement available to her during her entire incarceration was to
close her eyes and weep into her facemask. (See Lang Decl. ¶10). Even when locked
inside this closed solitary prison cell, she remained restrained in the same hobble re-
straints. (See Lang Decl. ¶10). The record shows she wasn't released and escorted out
of the federal courthouse until later that night, long after Court adjourned and the fed-
eral courthouse had been closed. *See* Trial Tr. 143-153.

Attorney Lang experienced significant post-traumatic stress symptoms since that
day and considers the experience to be one of the most traumatic events in her life.
(Lang Decl. ¶5). After her imprisonment on November 17, 2021, she hesitated and
questioned returning to her job at all. (Lang Decl. ¶6). Attorney Lang suffers from
post-traumatic stress disorder (PTSD) because of what happened to her on November
17, 2021. (Lang Decl. ¶6). The Court treated attorney Lang like an animal. (Lang
Decl. ¶7). She was handcuffed and chained in what is known as a "hogtie": double-

locking handcuffs, double-lock ankle/leg cuffs, a chain looped around attorney Lang's waist, chest and shoulders running down her center, between her legs, connecting her to her handcuffs to the leg irons. (Lang Decl. ¶7). Leg irons are rarely used, but they were here. (Lang Decl. ¶7).  Leg cuffs typically are used only when transporting prisoners outside of a secure area to prevent attempts to escape. (Lang Decl. ¶7). When placed in the metal leg cuffs, attorney Lang could not walk independently. (Lang Decl. ¶8).  The Marshalls removed her shoes, and she was forced to walk barefoot, flanked by officers holding her shoulders on each side, forcing her to take "mini-steps" as they led her down the halls of the courthouse, wherein she stumbled several times and was humiliated. (Lang Decl. ¶8).  In that locked prison cell, solitarily confined without any notion of time, barefoot inside a cinderblock prison cell equipped with a feces-filled urinal and littered with trash, she remained physically restrained and completely cuffed even when inside the locked prison cell. (Lang Decl. ¶8).  Permanently shackling prisoners with leg cuffs is illegal in the United States even when they are held in their cells. (Lang Decl. ¶8).  Such a long-term use of leg shackles causes pressure marks on the prisoner's ankles and can cause serious harm. (Lang Decl. ¶8).  Therefore, such a treatment of prisoners is commonly considered a cruel and unusual punishment. (Lang Decl. ¶8).  The full-harness combination applied to attorney Lang was excruciatingly painful. (Lang Decl. ¶8).  Attorney Lang experienced cuts to her wrists and ankles and felt the loss of circulation almost causing her to faint while hog-tied in her cell. (Lang Decl. ¶8).  Though handcuffs are meant as a temporary restraint, only to be used in the narrowest of situations, they were not used temporarily on attorney Lang. (Lang Decl. ¶8).

The Court had it out for Attorney Lang from the beginning, never allowing her to speak, paying deference to Attorney Voss and stipulating with opposing counsel without the permission or even verbal input of Ms. Lang:

> MR. VOSS: With permission of the Court, which is required to stipulate, we would stipulate.

THE COURT: All right, then. Then she won't testify to that. It's stipulated to. And so –

MS. LANG: Stipulate to where?

THE COURT: Ma'am, it's stipulated. There is no need for testimony. It's agreed that there is that discrepancy. So, Ms. Felix can testify about her shopper experience, and that's the only live witness.

MS. LANG: But, Your Honor, I do

THE COURT: I can't go through this again with you. Please be seated. Be seated, ma'am. Okay, bring the jury back.

MS. LANG: Your Honor, is there

THE COURT: Be seated, ma'am.

*See* Trial Tr. 33:7-21. From the outset, the Court erroneously portrayed this as being "defendant's case":

THE COURT: And so, largely, you will have documents before you which you will in the final analysis have to review and decide whether or not those documents either directly or circumstantially prove that the defendant the defendant's case.

*See* Trial Tr. 34:18-22

Attorney Lang began her opening statement only to be almost immediately silenced:

MS. LANG: Thank you, Your Honor. Good morning, ladies and gentlemen. My name is Marina Lang, and I represent, along with my colleague, plaintiff, Athena Cosmetics. The evidence will show we're here today because defendants broke their promise. If defendants had not broken their promise

THE COURT: Well, that's argument. We don't know whether they broke their promise or not. That's what the evidence in the case may or may not show. That's not the purpose of an opening statement.

1       In effect, I've outlined what the evidence is, but this is not the time

2   to argue that they broke a promise or didn't. I've told the jury that's what

3   the issue is. If you want to outline what the evidence will be that you in-

4   tend to introduce, you can do that, but you can't argue any inferences.

5       MS. LANG: We'll ask you, ladies and gentlemen, to decide if the

6   defendants broke their promise resulting in this current trial today. And

7   the defendants –

8       And what brought us to the promise, which is the subject Settlement

9   Agreement, started in 2019. The evidence will show that Athena Cosmet-

10  ics, after launching–

11      THE COURT: You're getting into exactly what I said would not be

12  at trial.

13      MS. LANG: Which is?

14      THE COURT: It's not what was involved in the underlying dispute,

15  it's what is  – what the Settlement Agreement provided and what objec-

16  tively the defendant disclosed pursuant to the agreement or should not

17  have. It was required to supply the names of the persons it bought the

18  product from, their suppliers and their contact information. And you can

19  tell the jury in relevant part what the Settlement Agreement required in

20  those precise –

21      If you want to read from the Settlement Agreement itself what parts

22  you're relying on, but not the underlying dispute, nothing about what

23  Athena launched or not.

24      MS. LANG: Indeed, Your Honor, but we are evaluating the materi-

25  ality of the breach.

26      THE COURT: There's no issue of materiality here.

27      MS. LANG: Well, the facts --

28      THE COURT: Ma'am, if we keep on going this way, I'm going to

have to excuse you from continuing your opening statement.

MS. LANG: I'm telling the Athena story.

THE COURT: Ma'am, Athena's story is not relevant here.

MS. LANG: Is why Athena entered into this Settlement Agreement relevant here?

THE COURT: No.

MS. LANG: The date that we've entered into, is that –

THE COURT: I've already told the jury that, but if you want to re-mind them of that, you can, and what the operable periods are for the dis-closures and limitation of future sales.

MS. LANG: The key fact about the date they entered There is a key fact about the date the settlement was entered into.

THE COURT: Nothing is key. That's argument. If you want –

I've told the jury what the dates are. The Settlement Agreement be-gins in January 2019, that is it's operable from that date until April 30, 2020, that's when there were certain requirements for the defendant to re-veal who they bought the product from. Defendant, as I said before, says it complied; the plaintiff says otherwise. Following the Settlement Agree-ment of April 30, the plaintiff was prohibited from making any future sales. Plaintiff says they have evidence of future sales. Defendant says not.

That's the case, simply. All right, thank you. Then, you may be seated. We're not getting anywhere. Thank you.

MS. LANG: Thank you, Your Honor.

*See* Trial Tr. 36-39

MR. VOSS: Okay. So, after the Settlement Agreement was entered into in April late April, last day of April of 2020, the evidence will show from places like Marketplace Walmart, you're going to see a document

that shows sales by AMN that extend all the way up to February 27 of 2020, and the evidence will show that there are two columns showing number of units sold

MS. LANG: Objection, Your Honor. These are self-authenticating documents, and he's not a witness.

THE COURT: Objection is overruled. He's just outlining what the documents he thinks will show.

MS. LANG: What he thinks will show? Objection. Speculation.

THE COURT: Ma'am, don't argue a ruling. I ruled. You may be seated. Go ahead, sir.

*See* Trial Tr. 36-39. The Court toyed with Ms. Lang, giving her contradictory instructions throughout the trial. Attorney Lang asked for evidence to be admitted, and the Court would first deny it, while later allowing it:

THE COURT: All right, you may call your first witness or introduce the records that we just discussed before the jury came back that can be received in evidence by way of a stipulation or by way of having him produce in discovery. You can take off those, the numbers of those exhibits.

MS. LANG: Your Honor, I will be entering those into evidence. I'd also like to read the first eight paragraphs of declaration of the sworn-under-penalty-of-perjury declaration of defendant Moishe Newman, if there is no objection.

THE COURT: That is not admitted, I mean, for any purpose. Correct?

MR. VOSS: Unless Counsel is now stipulating it can be received.

THE COURT: It can't be partially agreed to or not.

*See* Trial Tr. 44:3-20. The Court would then demand Attorney Lang read her requested "portion" of the Declaration of Defendant Newman later, yelling at her to "Read what I asked you to do. Read it" *See* Trial Tr. 100:9-10.

To be sure, although the Court later admitted all the evidence requested by Attorney Lang his reaction to everything she said was combative, punitive, and cruel.

Though the Court later characterized Attorney Lang as someone who was "yelling" during the trial, the record shows the Court was yelling at her and her witness to "speak up" throughout trial and yelling at the two women "I can't hear you". *See* Trial Tr. 45:21; 53:21-22; 55:14; 109:12-15.

The Court generally threatened attorney Lang with contempt unless she stopped talking, but never noticed Attorney Lang about what it was she was saying that upset the Court nor did the Court ever allow attorney Lang to be heard prior to arresting her for talking. The Court demanded she not respond to him, when all she needed was to ask the Court for clarification as to what he wanted:

> THE COURT: Ms. Lang, I want to tell you in as clear a way as I can. We've had any number of hearings and conferences. Your conduct has been consistent; that is, that you don't listen to the questions I ask, and you proceed to answer them in the way you want to and not the question, and you make many extraneous statements. That was meddlesome during the pretrial hearings, but now we're in a jury trial.
>
> MS. LANG: Yes, Your Honor.
>
> THE COURT: And I cannot tolerate that. It has started again.
>
> MS. LANG: But, Your Honor
>
> THE COURT: You're interrupting me again.
>
> And I'm just putting you on notice that if you continue to speak after I make a ruling on an objection, if you respond to what counsel says without permission and if you continue in that vein, it becomes almost impossible for me to control the proceedings. We've only been at this for

a short while, and I'm reaching a level of exasperation.

MS. LANG: I understand –

THE COURT: I didn't ask you to comment at this point. I'm just telling you that if this persists, you're going to give me no recourse but to hold you in contempt. That would be very undesirable from my stand-point. That's something in my many years on the Court I've done very rarely, but you have reached the point where I just cannot control the pro-ceedings. And you need not respond. That is

MS. LANG: It's not fair. It's not fair, Your Honor. (Ms. Lang weeping)

THE COURT: Ma'am, I'll determine what's fair.

MS. LANG: This is my case. This is my client. I'm advocating for them.

THE COURT: Ma'am

MS. LANG: They're paying me a lot of money –

THE COURT: Ma'am

MS. LANG: for advocating for them.

THE COURT: Ma'am, you are in contempt. You're in contempt of court. You are now in contempt of court. I'll deal with that following the trial.

Now we'll bring the jury back.

*See* Trial Tr. 47-48. The Court punished Attorney Lang for speaking, not for what she said. Even after telling her she was in contempt without explanation, the events pre-cipitating one of the Court's angry personal attacks against Attorney Lang ordering her to silence herself, were rendered grossly unnecessary by opposing counsel's stipu-lation to the evidence Attorney Lang sought to admit in the first place that was the cause of the Court's original personal rebuke of her talking:

MR. VOSS: It appears that documents 18 through 25 all are with a

custodian of records declaration, and we would not object to them.

THE COURT: All right, 18 to 25. Bring the jury back.

MR. VOSS: I'm assuming they want those.

THE COURT: Yes.

MS. LANG: And to finish my –

THE COURT: You're speaking again without permission. You have again violated my admonition.

*See* Trial Tr. 48:24-49:11. Attorney Lang did her best to follow all the instructions of the Court. For instance, the Court instructed her to enter into evidence at the very out-set of her case all of the third-party business records, stating on the record these would be admitted and he wanted it done right away (*See* Trial Tr. 31:14-32:), but then chal-lenged her attempts to abide by his request by arguing with her in front of the jury on the admissibility of this evidence, deferring to the opinion of defense counsel Voss in front of the jury, despite Voss already having stipulated to their admission at recess. *See* Trial Tr. 49-50.

The Court sustained nearly all opposing counsel's relevance objections. Attor-ney Lang did not understand why the Court deemed plaintiff's witness's testimony "ir-relevant" and when asked for an opportunity to explain its relevancy, was denied:

BY MS. LANG: Q. Ms. Felix, did Athena ever undergo product re-vision line?

MR. VOSS: Objection. Relevance.

THE COURT: Sustained.

MS. LANG: Your Honor, can I please have your permission to ex-plain why the timing is relevant here?

THE COURT: Not at this point.

*See* Trial Tr. 58:1-24.

The Court rushed Attorney Lang to conclude her case:

THE COURT: Would you please wrap this up? You made all the

points that we've gone through.

      MS. LANG: Your Honor, my final questions involve Ms. Felix's
post agreement purchases.

      THE COURT: You've done that. Cross-examination.

*See* Trial Tr. 70-71.

      During cross, the Court overruled all of attorney Lang's objections without
even affording her the opportunity to finish her objection:

      THE COURT: Well, there was no direct testimony regarding that,
but if you want to inquire of that as your witness, you can. In other
words, she's now Well, no, she's an adverse witness. You can –

      MR. VOSS: That's why I was asking for permission.

      THE COURT: Yes, you can do that.

      MS. LANG: Objection, Your Honor.

      THE COURT: Objection is overruled.

      MS. LANG: She doesn't know about – okay.

      THE COURT: Just make an objection, the Court rules. And that's
the way the process goes. Objection is overruled. You can ask the ques-
tion.

*See* Trial Tr. 78:8-21.

The Court allowed attorney Voss to enter into evidence hearsay documents:

      THE COURT: Don't ask me questions. You're to respond to my
questions. How was it prepared? Was it prepared from people in your
staff who looked at original documents of some kind, invoices or other
things?

      MS. LANG: No, Your Honor.

      THE COURT: Then how was it prepared?

      MS. LANG: All of the Walmart exhibits have been entered into evi-
dence. And so, if

1        THE COURT: I can't understand why you can't respond to a ques-

2  tion. It's not a question of –

3        MS. LANG: Because I'm a witness now.

4        THE COURT: Ma'am, you're just digging a deeper hole for your-

5  self.

6        MS. LANG: I have to guess. I'd be guessing.

7        THE COURT: Then who prepared this document?

8        MS. LANG: I'd be guessing.

9        THE COURT: Was it prepared by your office?

10       MS. LANG: Parts of it perhaps, but I'd be guessing. I would be

11 guessing.

12       THE COURT: Do you know, Mr. –

13       MR. HARRIS: No, Your Honor

14 *See* Trial Tr. 87:4-24.

15       Whenever Ms. Lang tried to talk to the Court to clarify issues and partici-

16 pate in the process of advocating for her client's best interests during trial, she was

17 threatened with more unspecified orders of contempt:

18       MR. VOSS: If I was able to pull my laptop out, I be able to tell

19       THE COURT: Go ahead. Take a look.

20       MR. VOSS: Thank you, Your Honor.

21       MS. LANG: Your Honor –

22       THE COURT: I didn't ask for a comment

23       MS. LANG: But, no, no, no. On a different issue.

24       THE COURT: You're finding other grounds for being held in con-

25 tempt.

26       MS. LANG: Just –

27       THE COURT: You don't learn. I'm going to give you an oppor-

28 tunity when I get to it. Not when you want to. When I get to it.

1          MR. VOSS: It will only take a moment, Your Honor.

2          THE COURT: Take your time.

3    *See* Trial Tr. 89-90.

4          Attorney Lang was not allowed to decide when or how plaintiff rested its

5    case, leaving her in a very precarious position for preserving her client's rights on ap-

6    peal after the Court summarily told her to stop talking and sit down. *See* Trial Tr. 101.

7    She was denied the ability to finish her closing argument, allowed to talk for less than

8    2 minutes:

9          THE COURT: Ma'am, I can't allow you to continue.

10         MS. LANG: Your Honor, I don't know what I'm allowed to argue,

11       because I don't know if they can see the Settlement Agreement.

12         THE COURT: You may be seated, ma'am.

13   *See* Trial Tr. 111-112.

14         Though attorney Voss was given every leniency to argue his closing state-

15   ments, Attorney Lang was forced to "abort" her argument, the Court's chosen word.

16   *See* Trial Tr. 111:17. For example:

17         MR. VOSS: then, it would be improper to say that my clients have

18       to provide information that their own investigator who does this for a liv-

19       ing couldn't find herself.

20         MS. LANG: Objection. Foundation.

21         THE COURT: Overruled. Go ahead.

22   *See* Trial Tr. 115.

23         THE COURT: I'm at the breaking point. I know of no other way to

24   …

25         THE COURT: You are in contempt. Is the marshal there? Take Ms.

26       Lang in custody. She's in contempt of court.

27         MS. LANG: I can't. I have a baby at home –

28         THE COURT: There's no other way to maintain decorum in the

courtroom.

        MS. LANG: Michael Harris can finish the trial. I will leave –

        THE COURT: Take her into custody.

        MS. LANG: I need my purse. (Ms. Lang being escorted out of the courtroom by the deputy marshal)

*See* Trial Tr. 117-118.

        MR. HARRIS: But can I think I know why she was upset. Her degree of being upset, I agree was improper. But without the Settlement Agreement and the schedules going to the jury, how can we show that the schedules are.

        THE COURT: Well, the schedules will go to the jury. The schedules are something other than the Settlement Agreement. The schedules are what was disclosed, and of course they have to go to the jury, but your co-counsel is so unclear about almost everything, that If she said the schedule should go to the jury, of course. Mr. Voss is not objecting to that. Are you?

        MR. VOSS: No, Your Honor.

*See* Trial Tr. 117-118.

        No evidence on the record shows the jury relied on bias or prejudice that Attorney Lang's conduct directly caused to reach its verdict. To be sure, if they had, their verdict would have been in favor of the defendant, not plaintiff. For a Court to grant a new trial based on the unsupported supposition that the jury disfavored the court is both *radical and unprecedented in this Circuit*. The record captured attorney Lang whispering to her co-counsel "It's so hard being a woman." See Trial Tr. 116:9118. It's not even clear from the record whether the jury or the Court even heard this statement. That was the only thing she said. The Special Jury Verdict form also wasn't returned from the jury in complete favor of Plaintiff, which shows the jury was not biased. See Dkt 189.

### 2.  The Court Violated Attorney Lang's Due Process Rights

In a sentence of imprisonment for contemptuous conduct, the Supreme Court has long distinguished criminal contempt from civil contempt by looking to the "character and purpose" of the sentence. See *Gompers v. Bucks Stove & Range Co*., 221 U.S. 418, 441 (1911). Confinement for contempt is criminal if it is "punitive" and for "vindicating the authority of the court." *Id.* In contrast, contempt is civil if it is "remedial" and "for the benefit of the complainant." *Id.* A civil contemnor "carries the keys of his prison in his own pocket" because civil contempt is "intended to be remedial by coercing the defendant to do what he had refused to do." *Id.* at 442 (internal quotation marks omitted). Imprisonment for a definite time period, regardless of the contemnor's future actions, is criminal because the contemnor is "furnished no key." *Id.* As the Supreme Court also has explained, "this dichotomy between coercive and punitive imprisonment has been extended to the fine context." *Bagwell*, 512 U.S. at 829. Thus, "where a fine is not compensatory, it is civil only if the contemnor is afforded an opportunity to purge." *Id.* Attorney Lang was handcuffed and chained in an illegal "hogtie" with double-locking handcuffs, ankle/leg cuffs, chest chain pinning arms to side, waist chain with attached groin chain connecting wrist cuffs to leg cuffs. (See Lang Decl. ¶7). This form of arrest is also illegal absence life-threatening circumstances. Leg cuffs are rarely used because it risks serious bodily harm to the prisoner when walking and must be used only when the threat outweighs the individual's constitutionally protected interest in avoiding physical restraint. Attorney Lang suffered pressure marks on her body from the restraints, and with her Von Willebrand disease, losing circulation could have killed her. (See Lang Decl. ¶8). Attorney Lang wears a metal medical bracelet indicating this disease, which was removed by the marshals so they could apply metal handcuffs to her wrists instead. (See Lang Decl. ¶8). Lesser due process protections are required in civil contempt, but at minimum, the court must notify the individual of the specific court orders they are being violated and allow the contemnor opportunity to cure its misconduct. Civil contempt is "intended to be

remedial by coercing the defendant to do what he had refused to do" and furnish the contemnor with the "key" to her freedom. *See Gompers*, 221 U.S. at 441. No notice, opportunity to be heard, or "key to freedom" was furnished here. In civil contempt, "The contemnor [need only be] given '"reasonable" notice of the specific charges and opportunity to be heard in his own behalf.'" *Little v. Kern County Superior Court*, 294 F.3d 1075, 1080 (9th Cir. 2002). The Court's requested contempt sanctions are moot here because there is nothing left to "remediate" and there is no injured *non-party* that requires compensation for direct injury caused by the contemnor's acts. The "potent weapon" of contempt sanctions may not be "founded upon a decree too vague to be understood." *Int'l Longshoremen's Ass'n v. Philadelphia Marine Trade Ass'n*, 389 U.S. 64, 76 (1967). "Civil contempt is appropriate only when a party fails to comply with a court order that is both specific and definite." *Gates v. Shinn*, 98 F.3d 463, 472 (9th Cir. 1996). No court order here was violated. Civil contempt orders must be reversed where they fail to notify the contemnor in "specific in terms" and describe "in reasonable detail" the acts sought to be restrained. Once the acts sought to be restrained have been so restrained, civil contempt sanctions have served their purpose. Attorney Lang was physically restrained, removed from the trial proceedings, and incarcerated in a prison cell. The Court's failure to observe criminal procedures is an independent reason to vacate the contempt order and sanctions. The record does not support a finding of either criminal or civil contempt. A contempt order here has no basis in law or fact. Further, a different judge must adjudicate these contempt proceedings as the record reflects an "intermittently continuous wrangle on an unedifying level" between Judge Wilson and Attorney Lang. *Offutt v. United States*, 348 U.S. 11, 17 (1954). The record shows the Court engaged in a pattern of personal attacks on Attorney Lang, even before the trial, and, therefore, has become embroiled to require recusal. The Court has become embroiled in a running controversy with Attorney Lang, the critical factor for recusal being the character of the trial judge's response to

the attorney's misbehavior during the trial, not the attorney's conduct considered alone. *Taylor v. Hayes*, 418 U.S. 488 (1974).[2]

**C.     Conclusion**

Based on the foregoing, the OSC must be vacated, any Order of Contempt and accompanying sanction Denied, and this case transferred to a new district judge.


January 10, 2022                                    /s/Marina Lang
                                                   Marina Lang
                                                   Respondent

---

[2] The Court degradingly spoke of Attorney Lang in the third-person as if she was not present and asked her male co-counsel to "control her," "THE COURT: Is she speaking? Your co-counsel is muttering and speaking under her breath. I can almost hear her now. Can't we control things? ¶ MR. HARRIS: We'll do our best, Your Honor." *See* Trial Tr. 116:2-8.